**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**TAMIKA EDMONDS,**

        Plaintiff,

        v.

**ENGILITY CORPORATION,**

        Defendant.

Case No. 1:13-cv-00893 (CRC)

**MEMORANDUM OPINION**

    Plaintiff Tamika Edmonds filed suit for pregnancy discrimination and retaliation after she was fired by her employer, Engility Corporation, while on maternity leave. Engility contends that it terminated Edmonds—along with numerous other employees—as part of a corporate reorganization that included replacing Edmonds' payroll specialist position with a higher-level cost accountant position requiring additional skills and experience. Because Edmonds has not provided sufficient evidence to support a reasonable inference that the company's explanation for terminating her was pretextual, the Court will grant summary judgment in favor of Engility.

    **I.    Background**

    International Resources Group ("IRG")—which undertakes international reconstruction and development projects—hired Tamika Edmonds in 2004 as a payroll specialist in the company's accounting department. Decl. of Pl. Tamika Edmonds ("Edmonds Decl.") ¶¶ 1–4. In 2010, IRG was acquired by aerospace and defense contractor L-3 Communications. Id. ¶ 1. Two years later, Engility Corporation was formed out of five L-3 Communications business segments, including IRG. Id.

    Following its formation, Engility "implemented a cost-cutting strategy by restructuring its operations and eliminating many overhead positions across each of its business segments." Def.'s

Statement of Undisputed Material Facts ¶ 3.  Nearly 300 employees left the firm through a combination of layoffs and voluntary exit packages.  Id.  Fourteen of the departed employees were formerly at IRG, including Edmonds' direct supervisor in the accounting department, Delana Faison, and IRG's controller, Josephine Nemmers.  Id. ¶ 4; Dep. Tr. of Josephine Nemmers ("Nemmers Dep.") at 8–10.  Edmonds herself was offered a voluntary exit package in November 2012, but she declined it.  Edmonds Decl. ¶ 16.

That same month, Edmonds was granted maternity leave to care for her newborn child.  Id. ¶¶ 11–12.  Soon after Edmonds took leave, as part of the business consolidation, Engility changed its accounting, timesheet, and job coding software systems.  Dep. Tr. of Karri Brown ("Brown Dep.") at 10, 18–19.  The company combined the accounting systems of each business segment into one centralized time and expense system called Unanet.  Nemmers Dep. at 16–23.  Employees entered their time and expense reports into Unanet, which then exported the data to the company's financial system, Costpoint.  Brown Dep. at 13–14.  Prior to adopting Unanet, IRG used a software package called Deltek to process and route timesheet data to the Costpoint system.  Nemmers Dep. at 55.  Nemmers, the controller, had designed controls in the old system that reduced employee error by limiting the number of organization, project, and account codes employees could enter in their timesheets.  Id. at 54.  The new consolidated system lacked these controls, which immediately resulted in a raft of coding errors.  Id. at 55.

Due to the extent of the mistakes and the risks created by the new accounting system—including the risk of sending erroneous bills to government customers—Nemmers decided Engility needed to hire an employee to manage the transition.  Id. at 19–21.  She recommended that the company hire a more experienced accountant with "the analytical background to understand the rate structure in place and the complexity in place of IRG's codes."  Id. at 74.  Accordingly, in February

2013, Nemmers received approval to eliminate Edmonds' payroll specialist position and advertise for a job costing accountant with the requisite experience and skills.  Id. at 21, 74.

Engility advertised the new position as an exempt, manager-level role in the company's finance and business services division, reporting directly to the controller.  Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 2.  The job posting explained that the new hire should have a bachelor's degree and would perform professional-level accounting work and prepare and analyze cost reports and costing audits.  Id.  Edmonds, who did not have a bachelor's degree, did not apply for the position.  Dep. Tr. of Tamika Edmonds ("Edmonds Dep.") at 244–46.

On March 25, 2013, Edmonds received a telephone call from Engility's Human Resources Manager Shelley Nixon.  Edmonds Decl. ¶ 15.  Nixon informed her that her position had been eliminated effective that day.  Id.  Nixon elaborated in an email, explaining to Edmonds that her position had been eliminated as a result of a company-wide reorganization based on a new business strategy and realigned corporate structure.  Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 10.  Nixon offered Edmonds eight weeks of severance pay, provided she execute a separation agreement and release. Id.  Edmonds declined to sign the agreement.  Edmonds Dep. at 239.

Edmonds responded that it "kind of feels like [I] have been terminated by the company" and asked "if so can you tell me if my performance was the deciding factor."  Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 10.  Nixon replied:

> Unfortunately, the changes Engility made to our accounting system, timesheets, and job coding have created so much confusion and so many mistakes on a weekly basis, that we now need a Job Costing Accountant who has extensive experience with various payroll systems and cost accounting in order to get the correct information to Engility payroll for processing.  So, this was definitely not a performance termination—your position simply no longer exists.

Id.  Nemmers reiterated this explanation in an email informing other Engility employees of Edmonds' last day.  Id. Ex. 12 (explaining that the company required "an individual who possess

[sic] the necessary skill as a job costing analyst/project accountant with a BA in accounting as well as intensive knowledge with time and labor management working.").

Engility offered the new position to Crystal Currin. Nemmers Dep. at 22. Currin has a bachelor's degree in economics from Virginia Tech. Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 9. Her background included 14 years of job costing experience, specializing in government contracts, as a senior program control analyst at Computer Sciences Corporation. Id. As part of Engility's ongoing restructuring of the accounting department, Currin was later transferred from Engility's Washington, D.C. office to its headquarters in Chantilly, Virginia. Brown Dep. at 16–19.

Edmonds filed this suit in January 2014. She claims that Engility violated her right to maternity leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. and the District of Columbia Family and Medical Leave Act, D.C. Code § 32-502, et seq.; retaliated against her for exercising her right to maternity leave; and unlawfully discriminated against her pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(k), which makes it unlawful to discriminate on the basis of sex, including pregnancy. Edmonds alleges that Engility's stated reasons for firing her were pretextual. As evidence of pretext, she mainly contends that Currin's new position is essentially the same as the position from which she was fired, and that her supervisor, Josephine Nemmers, expressed bias against her pregnancy.

Engility has moved for summary judgment, arguing that Edmonds has not disputed the facts supporting its legitimate business reasons for terminating her. Specifically, it claims that Edmonds has not offered evidence sufficient for a reasonable jury to infer that the company's reorganization and need for a more experienced accountant were not the actual reasons for her termination.

**II.     Legal Standards**

    A.     <u>Standards of Review</u>

The Court must grant a summary judgment motion if the moving party has demonstrated that there is no genuine issue of material fact.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Court draws all reasonable inferences from the facts in the plaintiff's favor, accepts as true all competent evidence presented by the plaintiff, and does not make credibility determinations or weigh evidence.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>George v. Leavitt</u>, 407 F.3d 405, 413 (D.C. Cir. 2005).

    B.     <u>Statutory Standards</u>

For claims of discrimination under Title VII and claims under the FMLA and DCFMLA, courts generally apply the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Gleklen v. Democratic Cong. Campaign Comm., Inc.</u>, 199 F.3d 1365, 1367 (D.C. Cir. 2000) ("Given that the Pregnancy Discrimination Act and D.C. Human Rights Act Provisions in question are identical, and in the view of the general similarity of the [Family Medical] Leave Act, the <u>McDonnell Douglas</u> approach offers a coherent method of evaluating the evidence for all three alleged violations.  For the most part, [the] claims may be analyzed simultaneously."); <u>see also</u> <u>Hopkins v. Grant Thorton Int'l</u>, 851 F. Supp. 2d 146, 153 (D.D.C. 2012) (applying the burden shifting framework for both discrimination and retaliation claims under the FMLA and DCFMLA).  Under the <u>McDonnell Douglas</u> framework, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination or retaliation.  411 U.S. at 802.  The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its challenged action.  <u>Id.</u>  If an employer asserts a legitimate, non-discriminatory reason, the only question for the court to consider is whether the plaintiff has offered sufficient evidence for a

reasonable jury to infer that the employer's asserted reason was not the actual reason for the action. Brady v. Office of the Sergeant of Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

**III.   Analysis**

Engility concedes that Edmonds has set forth a *prima facie* case of discrimination and retaliation based on the temporal proximity of her termination and her maternity leave. The company has also responded with several legitimate, non-discriminatory rationales for terminating Edmonds. The question, then, is whether Edmonds has met her burden to produce sufficient evidence to counter these explanations and permit a reasonable jury to infer that Engility's decision to terminate her was pretext for pregnancy discrimination. The Court concludes she has not.

A.   Engility's Asserted Legitimate Business Reasons

Engility asserts three legitimate, non-discriminatory reasons for terminating Edmonds. First, it maintains she was terminated as part of the company's larger reorganization. Def.'s Statement Undisputed Material Facts ¶ 9. It argues that eliminating Edmonds' position was but one of a series of changes to the accounting department during this enterprise-wide restructuring. Other changes included moving to a consolidated and more complex accounting system; eliminating the position of Edmonds' direct supervisor Delana Faison; and laying off the company's controller (and another one of Edmonds' supervisors), Josephine Nemmers. Id. ¶ 4.

Second, Engility contends that Edmonds was terminated because the company eliminated its Washington D.C accounting department altogether and shifted its functions to the company's offices in Virginia and New Jersey. Id. ¶ 14. Crystal Currin, the employee hired after Edmonds was terminated, now works in Engility's headquarters in Chantilly, Virginia. Id.

Third, Engility maintains that Edmonds' position was replaced with one requiring more skills and experience, and that Currin, who filled the new position, is performing a much different role than the one Edmonds performed. Unlike Edmonds' position, the job costing accountant is an

6

exempt position that requires a bachelor's degree. Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 2. Engility also points to testimony that Currin is performing numerous functions that Edmonds never performed, including payroll management, systems administration, systems design, and independent interactions with auditors. See Nemmers Dep. at 74, 56, 87. Engility adds that Edmonds' failure to apply for the new position supports its argument that the two positions are not the same. Def.'s Statement Undisputed Material Facts ¶ 11.

On their face, Engility's proffered rationales constitute legitimate, non-discriminatory reasons for terminating Edmonds. The burden thus shifts back to Edmonds to set forth sufficient evidence for a reasonable jury to infer that Engility's explanations for dismissing her were pretexts for pregnancy discrimination and retaliation for taking maternity leave.

      B.      Evidence of Pretext

To meet her burden, Edmonds primarily attacks Engility's third rationale: that the new position is more complex than her former job. In a declaration executed after discovery ended and in opposition to Engility's summary judgment motion, Edmonds contends that the new job costing accountant position is in fact substantially similar to her old role. This argument fails for a number of reasons.

First, Edmonds' declaration itself falls short of establishing that the two positions are on par. In it, Edmonds claims she performed only some of the nine functions listed in the job costing accountant job description. Edmonds Decl. ¶¶ 6–7. She does not contend that she allocated and mapped accounts to appropriate cost pools or responded to queries from employees and departments regarding time, expenses, taxable benefits and other questions. Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 2; Currin. Dep. at 23, 26-27. While Edmonds maintains she "was never given the opportunity to return to work and use the new system," Edmonds Decl. ¶ 18, her declaration

fails to rebut Engility's argument that Currin was hired to take on different, additional responsibilities as compared to Edmonds' former role.

More importantly, Edmonds' argument that the two positions are substantially similar is directly contradicted by the deposition testimony of numerous witnesses, including Edmonds herself. Nemmers testified that, starting in January 2013, the controls that she had built into the previous system were no longer in place, which resulted a dramatic increase in inaccurate entries. Nemmers Dep. at 55. As a result, Currin was tasked with designing controls to reduce employee error, a task Nemmers (not Edmonds) had performed in the old system. Id. at 54–57. Nemmers also testified that Currin performs tasks on an ongoing basis that were previously undertaken by Edmonds' supervisors. Id. at 54, 56. And, unlike Edmonds, whose data entries were validated by her superior before they were posted, Currin directly validates data entries for payroll processing. Id. at 70.

Currin confirmed that her responsibilities are broader than those Edmonds had. For example, Currin explained that she meets independently with auditors. If Edmonds met with auditors, it was at the direction of her supervisor. Compare Currin Dep. at 28 ("Q. Do you meet directly with auditors? A. I have.") with Nemmers Dep. at 85–87 ("Q. Would Ms. Edmonds have been present at those meetings [with the auditors]? A. Not that I am aware.") and Edmonds Dep. at 119 ("It would have been my supervisor [who] would have asked me to address the auditors with questions.").

Edmonds' own deposition testimony supports the conclusion that Currin performs more complex tasks with greater discretion. For example, Edmonds testified that she did not independently resolve cost accounting problems. Id. at 121 ("Q. So with respect to this particular item, it says assist controller, would you have worked with Josephine [Nemmers] in resolving and answering cost accounting problems? A. Yes, but the cost accounting problems, I guess, they put in

cost accounting. I'm speaking of accounting problems, and they put in cost accounting problems, but I said assisting her with accounting problems and questions that she had."). Edmonds' testimony also supports Engility's argument that Currin performs the work of at least one of Edmonds' supervisors, if not two. Id. at 196–97 ("Q: After Delana left, did the company hire somebody? . . . A. I don't know. Crystal Currin. She's doing that position."). Finally, Edmonds stated at her deposition that she "already knew about the whatever mistakes that was going on with the Engility payroll processing. So I knew [other payroll employees] didn't cause the mistakes. It was the system, Engility system itself." Id. at 162. She also stated that she thought the system consolidation would only require putting in new codes, like any other acquisition. Id. at 163. Edmonds thus did not indicate, at least in the excerpts provided to the Court, that she understood the root cause of the errors resulting from the transition to the new system, or that she would have been able to design and implement controls to prevent them, as Currin was specifically hired to do.

In sum, Edmonds has failed to offer evidence that casts doubt on Engility's explanation that Currin's position involves significant new responsibilities, including tasks previously performed by one or more of Edmonds' supervisors. The depositions and declaration do not support an inference that Edmonds had the skills or experience to perform those functions. Although Currin may be responsible for some of the tasks Edmonds previously carried out, she also performs additional complex tasks with more autonomy than Edmonds was afforded. Finally, Edmonds has not contested at all the company's other two explanations for terminating her: the enterprise-wide restructuring and elimination of the Washington, D.C. accounting department. Edmonds thus has failed to meet her burden to rebut Engility's legitimate rationales for her termination.

   C. <u>Other Evidence of Discrimination</u>

Having failed to undermine Engility's proffered rationales for her termination, Edmonds attempts to demonstrate pretext by suggesting that comments by Nemmers show an anti-pregnancy

bias on her supervisor's part.  Nemmers allegedly made the comments after Edmonds told her she was pregnant again and later when she asked to go to the doctor.  Edmonds recalled the comments as follows in her deposition:

> A. And it came up where I said, we was talking about college and our oldest kids going to college, and I said I would be dealing with kids for the rest of my life, and that's when I told her I was pregnant again.
>
> Q. What did she say when you told her?
>
> A. That's when she made the comment that how many times I'm going to get pregnant, I'm pregnant again?
>
> Q. Is that all she said?
>
> A. Well, she didn't say congratulations.
>
> Q. I'm saying, what else did she say?
>
> A. That's about it of the conversation because once she said that, I didn't want to talk anymore.
>
> Q. Okay. Did she make any other comments besides that one in 2012 about your pregnancy?
>
> A. Well, she would make comments every time I go to the doctor of how many times I need to go to the doctor, or why do I need to go to the doctor during so many times. She would just make little comments of how many times I had to go to the doctor.

Edmonds Dep. at 276.  Nemmers did not recall the alleged comments.  Nemmers Dep. at 85.

What is the Court to make of this alleged exchange?  Given that Edmonds initiated the conversation by noting that she would be "dealing with kids for the rest of my life," Nemmers response—" how many times [are you] going to get pregnant"—is not so obviously offensive in context as to demonstrate bias.  But even if Nemmers' comments plausibly could be construed to reflect a negative attitude towards Edmonds' pregnancy, relying solely on them to overcome Engility's three proffered rationales asks too much.  Nemmers had no control over two of the factors leading to Edmonds' termination—the corporate consolidation and office move—which apparently cost Nemmers her job as well.  And as discussed above, Edmonds has failed to contradict Engility's evidence that Engility hired Currin to perform—and that Currin is

performing—more complex job responsibilities. Absent a successful rebuttal of any of Engility's rationales, Nemmers' purported comments do not otherwise raise a reasonable inference of pretext.

### IV. Conclusion

Because Engility has offered legitimate, non-discriminatory reasons for terminating Edmonds, and Edmonds has not rebutted those explanations with evidence that would raise an inference of pretext in the mind of a reasonable jury, the Court will grant summary judgment for Engility. The Court will issue an order consistent with this opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: March 6, 2015